UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAINI REID GILMORE,

               Plaintiff,                      Case No. 11-12641

v.                                      Honorable Patrick J. Duggan
                                      Magistrate Judge R. Steven Whalen

ITC HOLDINGS CORP.,
a Michigan corporation,

               Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is an employment discrimination case arising under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* (2012), Michigan's Elliot-Larsen Civil Rights Act, Michigan Compiled Laws § 37.2101, *et seq.*, the Equal Pay Act, 29 U.S.C. § 206(1)(d), and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3). Plaintiff worked as a Policy and Procedure Coordinator at Defendant Corporation from October 30, 2006 until her termination on June 20, 2011. Plaintiff contends that Defendant discriminated against her with respect to job opportunities, promotions, performance evaluations, and compensation. She further contends that after complaining about discrimination beginning in April 2009, she became the target of retaliation. Plaintiff exhausted her administrative remedies and filed a timely complaint in this Court on June 17, 2011. Plaintiff filed an amended complaint on June 20, 2011 to add an allegation of retaliation in connection with the termination. Presently before the Court is Defendant's Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56.

The Court reviewed the parties' submissions and held oral argument on December 20, 2012. For the reasons stated herein, the Court grants Defendant's Motion for Summary Judgment and dismisses Plaintiff's claims with prejudice.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Raini Gilmore began working as a Policy and Procedure Coordinator in the Policies and Procedures Group at Defendant ITC Holdings Corporation (hereinafter "Defendant" or "ITC") on October 30, 2006.[1] (Pl. Dep., Pl's Br. in Resp. Ex. 2, at 26:13-20.) Plaintiff remained in this position, despite expressing an interest in and applying for several other positions at ITC, until her eventual termination on June 20, 2011. (June 20, 2011 Letter, Pl.'s Br. in Resp. Ex. 3.) Other members of the Policies and Procedures Group included Mike Ayotte, who was hired on March 19, 2007 as Manager of Compliance and Training and was Plaintiff's immediate supervisor, Jackie Swanson, a contract employee who worked in an administrative support function until the summer of 2008, and Paul Bourgeau, who officially commenced his position as Principal Policy and Procedure Coordinator on May 14, 2007.[2] (Pl.'s Br. in Supp. Ex. 13.) The Principal Policy and Procedure Coordinator position differed from the Policy and Procedure Coordinator position in a two pertinent ways: (1) the Principal was viewed as a "team leader" with some "supervisory" authority although many of the day-to-day duties were similar; and (2) the Principal was classified as a higher pay grade position meaning that

---

[1] Plaintiff signed the ITC Employment Application on October 23, 2006. (Pl.'s Br. in Supp. Ex. 13.)

[2] Bourgeau worked at ITC as a contractor from an outside consulting firm beginning in October 2003. (Bourgeau Dep., Def.'s Br. in Supp. Ex. 3, at 13:12-13.)

the Principal was paid more than the non-Principal. (Def.'s Br. in Supp. 28; Organizational Chart, Ex. 5; Position Descriptions, Ex. 49.)

In May of 2008, ITC restructured the Policies and Procedures Group.  (Def.'s Br. in Supp. 3-4.)  Ayotte was elevated to the position of Director of Compliance and Training, Deborah Yinger became Manger of Training, and Clarke Schroeder was brought in as Manager of Compliance.  (*Id.*; Pl.'s Br. in Resp. 8.)  Schroeder became Plaintiff's immediate supervisor.  (Def.'s Br. in Supp. 3-4.)  Around the same time, Bourgeau started a new position outside of the Policies and Procedures Group as a Supply Chain Manager. (Bourgeau Dep., Def.'s Br. in Supp. Ex. 3, at 5:13.)

The organizational change meant that the Policies and Procedures Group now included two manager positions instead of one.  As such, ITC did not deem it necessary to hire a Principal Policy and Procedure Coordinator to replace Bourgeau.  (Def.'s Br. in Supp. 4; Ayotte Dep., Def.'s Br. in Supp. Ex. 6, at 60.)  Instead, ITC posted a position for a second Policy and Procedure Coordinator, which was filed by Barbara Marion in summer of 2008.  (Marion Dep., Def.'s Br. in Supp. Ex. 7, at 8.)

During Plaintiff's tenure at ITC, Plaintiff performed her substantive job duties well but struggled to get along with co-workers.  (Performance Evaluations, Def.'s Br. in Supp. Exs. 11, 15, 16, 19, 22.)  In Plaintiff's Mid-Year Review for 2010, Schroeder stated: "While your command of the job is good, one area, that is equally if not more important, that is affecting your overall performance and effectiveness is your communication and working relationship with your co-workers."  (2010 Mid-Year Review, Def.'s Br. in Supp. Ex. 22.)  Plaintiff acknowledges that she "had issues" with

3

many of her co-workers including Bourgeau, Marion, and Swanson.  (Gilmore Dep., Def.'s Br. in Supp. Ex 1, at 154:4-7.)  These issues included sending frequent emails to supervisors and management complaining about co-workers (*see, e.g.*, Defendant's Brief in Support Exhibit 8) or meetings called in an effort to work through interpersonal problems (*see, e.g.*, Marion Deposition, Defendant's Brief in Support Exhibit 7, at 84:8-23).

While employed at ITC, Plaintiff expressed an interest in many jobs, including the Principal Policy and Procedure Coordinator position, and applied for several others. (Def.'s Br. in Supp. 17-18 (succinctly listing the various positions Plaintiff sought)). Despite her interest in these positions, Plaintiff remained in her position as a Policy and Procedure Coordinator.

After Plaintiff's 2008 performance evaluation, which occurred on April 8, 2009 and rated Plaintiff a 3.6 on a five-point scale, Plaintiff emailed Human Resources regarding what she perceived as gender and wage discrimination.  (2008 Performance Review, Def.'s Br. in Supp. Ex. 15; Apr. 8, 2009 Email, Def.'s Br. in Supp. Ex. 34.) Plaintiff noted that since being hired at ITC, "three men from outside of the company [have been] hired above me."  (*Id.*)  Many of these positions, Plaintiff noted, did not exist prior to the men being hired and that in the case of the Principal position, the position was eliminated when Bourgeau (a male) moved to another department.  (*Id.*)  Plaintiff closed the email by referencing Human Resource's responsibility to remedy differential wage

levels between men and women.[3]  (*Id.*)  Plaintiff made other complaints regarding

perceived discrimination to ITC's ethics hotline in March 2010.  (Def.'s Br. in Supp. 12.)

Ultimately, Plaintiff filed an EEOC charge on January 11, 2011, alleging gender

discrimination, retaliation, and a violation of the Equal Pay Act.  (EEOC Charge, Def.'s

Br. in Supp. Ex. 41.)  After receiving a right-to-sue letter from the EEOC, Plaintiff filed a

timely complaint in this Court on June 17, 2011.  Plaintiff filed an amended complaint on

June 20, 2011 – the same day she received official notice of her termination from ITC –

to include allegations related to the termination.

Plaintiff's Amended Complaint asserts six causes of action: (1) Count I: Gender

Discrimination under Title VII; (2) Count II: Gender Discrimination under Michigan's

Elliot Larsen Civil Rights Act ("ELCRA"); (3) Count III: Retaliation under the Fair

Labor Standards Act ("FLSA"); (4) Count IV: Retaliation under Title VII; (5) Count V:

Retaliation under ELCRA; and (6) Count VI: Equal Pay Act Violation.  At the conclusion

of discovery, Defendant filed a Motion for Summary Judgment pursuant to Federal Rule

of Civil Procedure Rule 56.  It is on this Motion which the Court issues its ruling today.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2012).  A court

---

[3] After receiving this complaint, Human Resources Director Christine Kujawa conducted an investigation which included "an analysis of each person she cited and their promotion history and salary history, and also looked at the salaries of other women and men in the corporation to see if there were any issues."  (Kujawa Dep., Def.'s Br. in Supp. Ex. 35, at 48:6-18.)  No wage disparities were found.

5

assessing the appropriateness of summary judgment asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986)).

The initial burden of proving the absence of a genuine dispute rests with the movant, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986), who "must support the assertion by: (A) citing to particular parts of materials in the record…; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact[,]" Fed. R. Civ. P. 56(c)(1)(A)-(B).   While this inquiry requires the Court to construe factual disputes, and the inferences there from, in the light most favorable to the non-moving party, only disputes over facts that might affect the outcome of the suit preclude the entry of summary judgment. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

If the moving party discharges their initial burden using the materials specified in Federal Rule of Civil Procedure 56(c), the burden of defeating summary judgment shifts to the non-movant who must point to specific material facts – beyond the pleadings or mere allegation – which give rise to a genuine issue of law for trial. *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2514.  A mere scintilla of evidence supporting the non-movant's claim will not prevent summary judgment; rather, there must be evidence on which a jury

6

could reasonably find for the non-movant.  *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011).

Moreover, if, "after adequate time for discovery and upon motion," the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial[,]" a court should enter summary judgment in favor of the moving party.  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.  When this occurs, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* 477 U.S. at 323, 106 S. Ct. at 2552.  Thus, if the non-movant does not support the elements of a claim or defense, the moving party is "entitled to judgment as a matter of law."

## III.   DISCUSSION

Before delving into the merits, the Court addresses some preliminary procedural issues bearing on Plaintiff's case in Section (A) immediately below.  The Court then proceeds to address Plaintiff's (B) gender discrimination claims under Title VII and ELCRA, (C) retaliation claims under Title VII, ELCRA, and the FLSA, and (D) Equal Pay Act claim.

### A.   Preliminary Issues: Statutes of Limitation and Exhaustion

Plaintiff worked at ITC for nearly five years and the events giving rise to this lawsuit occurred over this time period.  This raises some preliminary matters which the Court must address, namely, which events form the basis of Plaintiff's claims and which

7

simply serve an evidentiary function, illuminating the general atmosphere of ITC while Plaintiff worked there.

Plaintiff's claims arising under Title VII extend only to acts occurring within the 300 days preceding the filing of Plaintiff's EEOC charge.  This is because for a Title VII charge to be timely, a plaintiff in a deferral state such as Michigan must file a claim with the EEOC within 300 days of the alleged discriminatory act.  42 U.S.C. § 2000e-5(e)(1). The filing of an EEOC charge is a prerequisite to bringing a Title VII claim in federal court.  *Id.* § 2000e-5(f)(1); *see also Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001) ("It is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge.") In this case, Plaintiff filed a charge of discrimination with the EEOC on January 11, 2011.  (EEOC Charge, Def.'s Br. in Supp., Ex. 41.)  Because the EEOC charge could not include events occurring more than 300 days before January 11, 2011, Plaintiff could not exhaust her administrative remedies with respect to those events.  Therefore, the Court may not consider claims based on events occurring before March 17, 2010.[4]

Plaintiff's claims arising under Michigan's ELCRA are subject to an even shorter statutory period.  Claimants generally have three years to file a discrimination claim in Michigan.  Mich. Comp. Laws § 600.5805(10).  In this case, however, ITC's Employment Application specifically shortened the limitations period for "any action or

---

[4] At oral argument, Plaintiff's counsel agreed that events occurring before March 17, 2010 may not form the basis of any claims.

8

suit against the Company arising out of [her] employment" to 180 days.  (Employment Application, Def.'s Br. in Supp. Ex. 2.)  While contractual waivers of statutes of limitations are invalid under Title VII, they are permissible under Michigan law.  *Lewis v. Harper Hosp.*, 241 F. Supp. 2d 769 (E.D. Mich. 2002).  As such, any state law claims arising prior to December 19, 2010 are time-barred.[5]

## B.    Counts I and II: Gender Discrimination

The familiar burden-shifting framework first articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), governs claims of gender discrimination under Title VII and ELCRA.  *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (noting that courts apply the same analysis to both Title VII and ELCRA claims); *Terwilliger v. GMRI, Inc.*, No. 97-1302, 1998 U.S. App. LEXIS 1724, at *3 (6th Cir. Feb. 3, 1998) ("Michigan applies the burden shifting analysis of *McDonnell Douglas*" to ELCRA claims) (internal citations omitted).  This burden-shifting framework aims to resolve "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment[,]" that is, "whether the plaintiff was the victim of intentional discrimination." *Curry v. SBC Communs., Inc.*, 669 F. Supp. 2d 805, 824 (E.D. Mich. 2009) (citation omitted).

To survive summary judgment, a plaintiff must first establish a prima facie case of gender discrimination.  A plaintiff using circumstantial evidence, as in the instant case, must show that (1) she is a member of a protected class, (2) she was qualified for the

---

[5] December 19, 2010 is 180 days before June 17, 2011, the date Plaintiff filed her initial complaint in federal court.

position, (3) she suffered an adverse employment action, and (4) she was treated differently than similarly situated, non-protected employees. *Noble v. Brinker Intern, Inc.*, 391 F.3d 715, 728 (6th Cir. 2004). Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory explanation for the discharge. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252, 101 S. Ct. 1089, 1093 (1981) (citation omitted); *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 862 (6th Cir. 1997). If the employer succeeds in this endeavor, the plaintiff then has the opportunity to demonstrate that the employer's proffered explanation is a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43, 120 S. Ct. 2097, 2106 (2000).

In the instant case, Defendant does not dispute the first two elements of Plaintiff's prima facie case: Plaintiff is a woman and was qualified for the position. Defendant does, however, argue that Plaintiff cannot satisfy her burden with respect to the remaining elements.

## 1.    *Failure to Promote*

Plaintiff contends that throughout the course of her employment, she submitted applications for various jobs that she was qualified for but that she was rejected because of her gender. (Compl. ¶¶ 13-14.) Relatedly, Plaintiff claims that she expressed an interest in certain positions but that ITC management prevented her from applying and ultimately gave the job to a less qualified or equally qualified male. (*Id.* ¶¶ 15-16.) Specifically, Plaintiff alleges that she was denied the following employment opportunities at ITC: (1) Principal Policy and Procedure Coordinator (May 2007-May

10

2008)[6]; (2) Account Representative, Stakeholder Relations (May 2007); (3) Safety Department position (2008); (4) Business Analyst, IT Department (September 2008); (5) Senior Systems Analyst, IT Department (November 2008); (6) Manager of Training (July 2009); (7) CIP Compliance Manager (June 2010, April 2011); and (8) Manager, Marketing and Corporate Affairs (March 2011).

In moving for summary judgment, Defendant points out that "Plaintiff's claims with respect to all but the last two of these alleged employment opportunities are barred by the statutes of limitation." (Def.'s Br. in Supp. 18.) As discussed above, Defendant is correct and Plaintiff acknowledges this. Any events before March 17, 2010 are not properly before this Court. To the extent Plaintiff's claims are grounded in such events, Defendant is entitled to judgment as a matter of law. Plaintiff's first six failure to promote claims are accordingly dismissed.

Summary judgment is similarly warranted for the remaining two positions as Plaintiff has not established a genuine issue of material fact as to whether she was denied either the CIP Compliance Manager position or the Manager of Marketing and Corporate Affairs position because of her gender. In order to establish a prima facie case of gender discrimination based upon a failure to promote, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the

---

[6] The dates in parentheses indicate when Plaintiff expressed an interest in or applied for the particular position.

time her request for a promotion was denied. *Nguyen v. City of Cleveland*, 339 F.3d 559, 562-63 (6th Cir. 2000). The problem with Plaintiff's claims involves the second element: Plaintiff cannot establish that she possessed the requisite qualifications for either position, and in the case of the CIP Compliance Manager position, she did not submit an application.

The CIP Compliance Manager position was initially posted in June 2010. (Job Posting, Def.'s Br. in Supp. Ex. 46.) The position was reposted with modified qualifications in April 2011. (*Id.*) The original posting required a bachelor's degree in Information Systems, Business or other related technical field, seven years of experience in Information Security, Project and Program Management experience, and experience with information security programs focused on NERC CIP compliance. (*Id.*) The April 2011 posting permitted an applicant to possess less education in Information Systems if accompanied by more experience in Information Technology and Information Security Management. (*Id.*) During her deposition, Plaintiff indicated that she spoke with Mike Pokas, the ITC Information Technology Department hiring manager, about the CIP Compliance Manager Position. (Gilmore Dep., Def.'s Br. in Supp. Ex. 1, at 310:1-4.) Plaintiff then acknowledged that she did not have a degree in information systems, business or a related technical field. (*Id.* at 310:5-11.) Plaintiff further noted that she did not possess seven years of experience in information security. (*Id.* at 310:12-15.)

In addition to lacking the requisite qualifications, Plaintiff never applied for the position as posted in June 2010, a decision driven at least in part by the fact that Pokas advised Plaintiff against doing so. (*Id.* at 311:1-3.) With respect to the April 2011

posting, Plaintiff again admitted that she did not possess the necessary qualifications.  (*Id.* at 311.)  Moreover, Plaintiff "did not formally apply for this position."  (*Id.* at 311:17.)

Plaintiff appears to claim that the denial of her application for the Manager of Marketing and Corporate Affairs position was motivated by gender or retaliatory animus because she believes that by this point in time, she had been "blackballed."  (Gilmore Dep., Def's Br. in Supp. Ex 1, at 316-17.)  Although applying for a managerial-level position, Plaintiff acknowledges that she had never worked in a marketing position.  (*Id.*, at 317:4-9.)  As such, Plaintiff cannot demonstrate that she was qualified for the position and cannot satisfy her burden of coming forward with evidence supporting a prima facie case.  Even assuming Plaintiff could make out a prima facie case, Defendant has articulated a legitimate, nondiscriminatory reason that justifies Plaintiff's rejection from the aforementioned positions: Plaintiff's admitted lack of qualification.  The record evidence does not support a finding of pretext.

In sum, six of Plaintiff's failure to promote claims are time-barred, making summary judgment appropriate as a matter of law.  With respect to the remaining claims, Plaintiff has not discharged her burden of demonstrating the existence of a dispute of material facts because Plaintiff has not come forward with evidence to support the elements of a prima facie case.  Therefore, Defendant is entitled to summary judgment.

## 2.   *Performance Evaluations*

Plaintiff claims she was subjected to gender discrimination, evidenced by the "stereotyped language often applied to powerful women, calling Plaintiff and her conduct

13

'domineering,'[7] 'overly authoritative,' [and] criticizing Plaintiff's 'tone[.]'" (Pl.'s Br. in Resp. 22-23.)  This language was used to describe Plaintiff in various performance evaluations.  Plaintiff contends that these negative performance reviews constitute an adverse employment action because they led to depressed raises and kept her mired in her Policy and Procedure Coordinator position.  (Pl.'s Br. in Resp. 22.)  Plaintiff alleges that similarly-situated male employees did not receive similar admonishment even though they engaged in conduct similar to her own.  (Pl.'s Br. in Resp. 21-23.)

Defendant argues that Plaintiff cannot establish the third element of a prima facie case pertaining to an adverse employment action because "[n]egative performance evaluations do not constitute adverse employment actions." (Def.'s Br. in Supp. 21.) Although the Sixth Circuit has held that "a negative performance evaluation does not [alone] constitute an adverse employment action," it can if "the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007).  ITC's Employee Handbook indicates that performance reviews are "important tool[s] in determining whether the employee's compensation is at an appropriate level and may be used to establish merit pay or bonuses, if available." (ITC Employee Handbook, Compensation and Benefits, Pl.'s Br. in Resp. Ex. 5.)  Thus, there is some relationship between evaluation scores and raises.

In the instant case, however, Plaintiff cannot establish that the negative performance evaluations diminished her annual raise.  The following chart, which shows

---

[7] This language was contained in Plaintiff's 2009 Mid-Year Performance Review, which was conducted in September 2009 and is therefore untimely.  (Def.'s Br. in Supp. Ex. 16.)

Plaintiff's annual performance rating and corresponding raise from 2007-2010, is helpful in understanding why this is so.

| 2007 Annual Review | | 2008 Annual Review | | 2009 Annual Review | | 2010 Annual Review | |
|--------|--------|--------|--------|--------|--------|--------|--------|
| Rating | Raise | Rating | Raise | Rating | Raise | Rating | Raise |
| 3.3 | 3.1% | 3.6 | 2.2% | 3.3 | 2.5% | 3.1 | 3.5% |

This chart illustrates that Plaintiff received her lowest raise (2.2%) after her 2008 annual performance review despite the fact that this review resulted in Plaintiff's highest performance rating (3.6).   Although Plaintiff received the same rating in her annual performance reviews for the years 2007 and 2009, Plaintiff's raise was higher in 2007 than it was in 2009.  Perhaps most interesting is that Plaintiff received her highest raise (3.5%) after her 2010 annual performance review despite receiving her lowest overall rating (3.1).  The record evidence, therefore, does not support Plaintiff's argument that the allegedly discriminatory performance evaluations had a direct adverse impact on her wages or salary.  Moreover, Plaintiff has submitted no evidence – either by way of deposition testimony or ITC documents – showing how raises are calculated.  In the absence of such evidence, Plaintiff is unable to demonstrate that the performance evaluations constitute an adverse employment action.

Moreover, the Court notes that Plaintiff has not demonstrated the existence of a disputed material fact with respect to her contention that these performance ratings "led to . . . lower potential for movement in the company."  (Pl.'s Br. in Resp. 22.)  Plaintiff does not point to any evidence in the record supporting this contention and does not even

allege that those in charge of hiring decisions in departments other than the Policies and Procedures Group even had access to the evaluations.

With respect to similarly-situated males, "Plaintiff asserts that no male would have received the same type of response or been subject to the same language from Defendant under the circumstances." (Pl.'s Br. in Resp. 23.)  As evidence, Plaintiff points to an incident in 2007 when Plaintiff and another female employee complained to Elizabeth Howell, the Vice President of Operations, about Bourgeau being "frequently rude and disrespectful." (*Id.*)  In response to their complaints, Howell "excused Bourgeau's conduct as 'stress' related." (*Id.*; Meeting Notes, Pl.'s Br. in Resp. Ex. 6.)  The Court does not believe that this isolated incident with Bourgeau is comparable to the repeated and documented problems ITC had with Plaintiff, particularly as they related to her ability to work effectively with her co-workers.  Plaintiff admitted that she had issues working with many of her co-workers including Bourgeau, Marion, and Swanson. (Gilmore Dep., Def.'s Br. in Supp. Ex 1, at 154:4-7.)  The other examples cited by Plaintiff as evidence that she was treated more harshly than male employees are similarly unavailing.  (Def.'s Br. in Supp. 24.)

Even if Plaintiff could make a prima facie case, Defendant has articulated a legitimate, nondiscriminatory reason for the lower evaluation scores, namely, that there was a documented history of a variety of behaviors management deemed problematic and disruptive.  After being counseled on several occasions, Plaintiff's conduct did not change, which ultimately led to the downgraded evaluations.

**3.       *Miscellaneous Instances of Disparate Treatment***

Lastly, Plaintiff claims that she was treated differently than similarly situated men with respect to the terms, conditions, and benefits of employment.  (Compl. ¶ 18.)  For example, on April 23, 2009, Plaintiff offered to work from home but was told to use sick time.  (Pl.'s Br. in Resp. 12, n.10.)  Plaintiff, however, knew that Bourgeau had worked from home on multiple occasions and was not told to charge the time as sick time.  (*Id.*; *id.* Ex. 22.)  Plaintiff also alleges that she was denied sick time on March 5, 2010 when she left work for a personal emergency and that she was not permitted to work an adjusted schedule to attend a weight loss class during business hours in July 2009.  (Def.'s Br. in Supp. 22.)  All of these events are time-barred thus rendering summary judgment appropriate as a matter of law.

**C.       Counts III-V: Retaliation**

Title VII, ELCRA, and the FLSA prohibit retaliation against employees who exercise their statutorily-protected rights.  42 U.S.C. § 2000e-3(a); Mich. Comp. Laws § 37.2701; 29 U.S.C. § 215(a)(3)[8].  The *McDonnell Douglas* burden-shifting framework governs claims of retaliation based on circumstantial evidence.  *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009).  To establish a prima facie case of retaliation under state or federal law, a plaintiff has the initial burden of establishing four elements: (1) the plaintiff engaged in protected activity; (2) the defendant knew about the

---

[8] Although the parties did not specifically mention the FLSA retaliation claim in their briefs or at oral argument, Plaintiff's allegations of retaliation for complaining about an Equal Pay Act violation are subject to the same standard governing her claims of retaliation under Title VII and ELCRA.  For the reasons discussed in this section, Plaintiff cannot establish a genuine dispute of material fact on the FLSA claim.

plaintiff's exercise of this right; (3) the defendant took an employment action adverse to the plaintiff; and (4) the protected activity and the adverse employment action are causally connected.  *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001); *Garg v. Macomb County Cmty. Mental Health Servs.*, 472 Mich. 263, 273, 696 N.W.2d 646, 653 (2005) (listing same elements in ELCRA retaliation analysis); *Niswander v. Cincinnati Ins. Co.*, No. 06-1086, 2007 U.S. Dist. LEXIS 28911, *14-15 (N.D. Ohio Apr. 19, 2007) (applying these elements to a claim of retaliation under the FLSA).  "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (quoting *Nguyen*, 229 F.3d at 563).

### a.    *Plaintiff engaged in Protected Conduct and Defendant Knew Plaintiff Engaged in Protected Conduct*

Defendant does not dispute that Plaintiff engaged in protected conduct or that ITC was unaware of Plaintiff's protected conduct.  Plaintiff engaged in protected activity by emailing Human Resources on April 8, 2009, to complain of gender and wage discrimination.  (April 8, 2009 Email, Def.'s Br. in Supp. Ex. 34.)  Plaintiff's complaint to ITC's ethics hotline in March 2010 accusing Schroeder of age and gender harassment was also protected conduct.[9]  (Def.'s Br. in Supp. 12.)  Lastly, Plaintiff's completion of the EEOC intake questionnaire in October 2010 and her filing of a formal EEOC charge on January 11, 2011 constitute protected conduct.  (Pl.'s Br. in Resp. 15; EEOC Charge, Def.'s Br. in Supp. Ex. 41.)

---

[9] A subsequent investigation concluded no harassment occurred.  (Report, Def.'s Br. in Supp. Ex. 38.)

*c.     Adverse Employment Action and Causal Connection*

In 2006, the Supreme Court took an expansive view of the type of conduct that qualified as materially adverse: "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71, 126 S. Ct. 2405, 2409 (2006) (internal quotation omitted). While the Court noted that "trivial harms" did not receive protection, the Court explained that it phrased the standard in general terms "because the significance of any given act of retaliation will often depend on the particular circumstances." *Id.*, 548 U.S at 68-69, 126 S. Ct. at 2415. Plaintiff alleges several adverse actions were visited upon her: (1) failure to promote; (2) negative performance evaluations resulting in lower raises and less mobility within ITC; and (3) her ultimate termination. Each alleged adverse action is addressed in turn.

i.     Failure to Promote

Plaintiff claims that she was denied job opportunities at ITC after having engaged in the protected conduct described above. These claims, however, mirror Plaintiff's allegations of failure to promote based upon gender. The retaliation claims fail for the same reasons described in Section III.B.1, *supra*. Because Plaintiff cannot establish a prima facie case of retaliation under the circumstances and because Defendant has articulated a legitimate, non-discriminatory reason, the Court grants summary judgment on Plaintiff's retaliatory failure to promote claims.

19

ii.     Performance Evaluations

Applying *Burlington Northern*'s interpretation of "materially adverse" to performance appraisals, the Sixth Circuit has held that "[i]f the Supreme Court views excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement as materially adverse conduct, then markedly lower performance-evaluation scores that significantly impact an employee's wages or professional advancement are also materially adverse." *Halfacre v. Home Depot, USA, Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007) (internal citation omitted);[10] *see also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 403 (6th Cir. 2008) ("By receiving a lower salary increase than he would have without the more negative evaluation, White was denied an increase in pay to which he was allegedly entitled.  Under our precedent, such a deprivation of increased compensation does constitute an adverse employment action.").

In the instant case, Plaintiff has not come forward with evidence that the critical performance evaluations negatively impacted her annual raises.  As discussed in the performance evaluation section alleging gender discrimination, III.B.2, *supra*, Plaintiff has not demonstrated that she received a lower salary increase after she first complained of discrimination in April 2009.  Although Plaintiff's overall rating in her 2009 evaluation was lower than her overall rating for the previous year (dropping 0.3 points), her raise was higher after the 2009 evaluation (2.5%) than it was after the 2008

---

[10] In *Halfacre*, the court found significant the fact that there was evidence that the plaintiff's raises were tied to his performance appraisals.  The court ultimately remanded the matter to the district court to determine the extent to which the lower scores impacted his earning potential.  *Id.*, 221 F. App'x at 433.

evaluation (2.2%).  (Pl.'s Br. in Resp. 17.)  As such, the evidence does not support this element of a prima facie case.  *Cf. White*, 533 F.3d at 403 (evidence that employee received lower salary increase than he would have without the negative evaluation was sufficient to establish the existence of an adverse employment action).  The Court, therefore, grants summary judgment on Plaintiff's performance evaluation claims.

### iii.    Termination

Undoubtedly, "[t]erminating a person's employment is a materially adverse action."  *Eades v. Brookdale Senior Living, Inc.*, 401 F. App'x 8, 10 (6th Cir. 2010) (unpublished).   Plaintiff runs into problems, however, with the fourth element of the prima facie case: establishing causation.  In order to establish the causal connection required in the fourth prong, Plaintiff must produce evidence sufficient to infer the employer would not have acted had the employee not engaged in protected activity.  *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003).

Plaintiff alleges that her termination was the culmination of an extended campaign of retaliation evidenced by the enhanced scrutiny Plaintiff was subjected to by Schroeder, her immediate supervisor.  This enhanced scrutiny revealed itself in performance evaluations beginning with the 2009 mid-year review and continued for the remainder of Plaintiff's employment.  Plaintiff points to Schroeder's admission that Howell asked him to document Plaintiff's behavior carefully "probably" sometime in "late 2009[,]" (Schroeder Dep., Plaintiff's Brief in Response Ex 16, at 57:4-17) as demonstrating retaliatory animus.   In essence, Plaintiff asks the Court to infer causation on the basis of temporal proximity.

21

The fact that the protected activity and adverse employment action are acutely near in time may serve as indirect evidence of retaliation. *Mickey*, 516 F.3d at 524 (reconciling Sixth Circuit cases and explaining that temporal proximity alone will not always suffice to establish a causal connection but that the inference of retaliation is strengthened when the proximity between the protected conduct and adverse action is very close); *Singfield v. Akron Metro. Hous. Auth.,* 389 F.3d 555, 563 (6th Cir. 2004) (finding that temporal proximity of three months was "significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie case"); *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004). *But see, e.g.*, *Tuttle*, 474 F.3d at 321 ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."). In this case, the length of time between the complaints and the enhanced scrutiny, the performance evaluations, and termination is too attenuated to find causation without something more.

Moreover, the evidence reveals that the complaint did not cause the enhanced scrutiny. Plaintiff had been counseled on particular behaviors throughout her employment at ITC and little changed. "[E]vidence that the employer had been concerned about a problem before the employee engaged in protected activity undercuts the significance of temporal proximity." *Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809, 822 (S.D. Ohio 2005) (quoting *Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002)). As discussed throughout this opinion, such evidence exists.

22

Plaintiff's termination in June 2011 was long after Plaintiff engaged in protected conduct.[11]  The termination followed Plaintiff's appeal of her 2010 annual performance review.  (2010 Professional Performance Review Appeal, Def.'s Br. in Supp. Ex. 25.)  In her written appeal, Plaintiff rejected each criticism contained in the evaluation notwithstanding the fact that Plaintiff had heard "some" of the criticisms on previous occasions.  (Gilmore Dep., Def.'s Br. in Supp. Ex. 1, at 288:5-15.)   While Howell wrote "entire appeal has a nasty edge" in the margins of Plaintiff's appeal, this is insufficient to demonstrate that the termination a product of retaliation.  (Pl.'s Br. in Supp. Ex. 34A.)

## D.    Count VI: Equal Pay Act

Plaintiff alleges that ITC violated the Equal Pay Act by paying a male employee higher wages for substantially equal work.  (Pl.'s Br. in Resp. 28-29.)  In an Equal Pay Act case, a plaintiff must show that an employer pays different wages to male and female employees for equal work on jobs requiring similar skill, effort, and responsibility and which are performed under similar working conditions.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S. Ct. 2223, 2228 (1974).  If a plaintiff makes this threshold showing, the burden then shifts to the employer to show that the wage differential is justified under one of the Act's four affirmative defenses: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality

---

[11] At oral argument, Plaintiff's counsel made it clear that Plaintiff is not claiming that the termination was retaliation for filing suit in federal court.

of production; or (4) any factor other than sex.[12] *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 825 (6th Cir. 2000); 29 U.S.C. § 206(d)(1).

Plaintiff's sole comparator in the instant case is Bourgeau. She alleges that as a Policy and Procedure Coordinator she should have received the same compensation as Bourgeau, who held the position of Principal Policy and Procedure Coordinator.[13] According to Plaintiff, this is because the two jobs required similar skills, effort, and responsibility despite the slight variations in job titles and job requirements.

Defendant argues that the Principal Policy and Procedure Coordinator position was materially different from the Policy and Procedure Coordinator position because Bourgeau was the team leader of the Policies and Procedures Group. (Def.'s Br. in Supp. 28; Organizational Chart, Ex. 5.) Although "Plaintiff and Bourgeau both developed and published policies, procedures, and processes, Bourgeau functioned in the role of a team leader, directing and distributing work, performing higher level analytical functions, and developing the processes to be used by the Policies and Procedures Group on a going forward basis." (Def.'s Br. in Supp. 28; Position Descriptions, Ex. 49.) The Court need not address whether the jobs were substantially similar, however, because irrespective of the job requirements, Defendant argues that it has an affirmative defense because the wage differential was based on factors other than sex.

---

[12] Unlike the burden shifting framework applicable to Title VII, the defendant bears the burden of proving the defense and "is not entitled to summary judgment unless it has satisfied its burden of demonstrating that there is no genuine dispute on any material fact in regard to this issue." *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 989 (6th Cir. 1992).

[13] Plaintiff's position was classified as a Grade 8 for remuneration purposes and her starting salary was $68,000 whereas Bourgeau's position was classified as Grade 9 and his starting salary was $86,500. (Pl.'s Br. in Resp. 29; Ex. 13)

To prove that the difference is justified by a factor other than sex, an employer must demonstrate that the disparity is not based on sex but rather on a legitimate business reason. *EEOC v. J.C. Penney*, 843 F.2d 249, 253 (6th Cir. 1988). Defendant argues that Bourgeau's higher salary was based on his education and experience. While education and experience are not generally considered when determining if the jobs require similar skills (unless the education or experience are directly relevant to the performance of job duties), these qualities are relevant for purposes of the affirmative defense asserted here. The Sixth Circuit has held that "[a] wage differential based on education or experience is a factor other than sex for purposes of the Equal Pay Act." *Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. Tenn. 2005), abrogated on other ground by *Fox v. Vice*, 131 S. Ct. 2205 (2011) (citations omitted).

Prior to becoming the Principal Policy and Procedure Coordinator in May 2007, Bourgeau worked at ITC as a contractor from an outside consulting firm and worked on policies and procedures in this capacity beginning in October 2003. (Bourgeau Dep., Def.'s Br. in Supp. Ex. 3, at 13:12-13.) Prior to 2003, Bourgeau worked at General Motors documenting and standardizing processes and practices. (Bourgeau Resume, Def.'s Br. in Supp. Ex. 4.) Bourgeau also acquired relevant experience while working at Budd Plastics. (*Id.*) At both General Motors and Budd Plastics, Bourgeau acquired experience directing the work of others. (*Id.*) Bourgeau's resume reflects that he had two bachelor's degrees from Michigan State University and an MBA from Oakland University when he was hired. (*Id.*)

25

At the time of hire, Plaintiff had no prior experience at ITC, less experience in the field, and a bachelor's degree from University of Michigan-Dearborn. (Pl.'s Resume, Def.'s Br. in Supp. Ex 2.) While Plaintiff was working on a master's degree in Performance Improvement Development at University of Michigan-Dearborn, at the time she was hired she had been enrolled in the program for approximately nine months. (*Id.*)

The Court finds that Defendant has satisfied its burden of establishing an affirmative defense under the Equal Pay Act. As such, summary judgment is appropriate on Plaintiff's Equal Pay Claim.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the Court finds that Defendant is entitled to summary judgment with respect to all of Plaintiff's claims.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

Date: December 27, 2012              s/PATRICK J. DUGGAN
                                     UNITED STATES DISTRICT JUDGE

Copies to:

**Jeffrey S. Burg, Esq.**
**David B. Calzone, Esq.**
**Susan H. Hiser, Esq.**